COMMODITY CREDIT CORPORATION *v.* AMERICAN EQUITABLE ASSURANCE COMPANY.

4-5694                                    133 S. W. 2d 433

Opinion delivered October 30, 1939.

*MacDougald, Troutman & Arkwright* and *Rose, Loughborough, Dobyns & House*, for appellant.

*J. I. Teague* and *Verne McMillen*, for appellee.

BAKER, J. Judgment was rendered for appellees, insurance companies, four of which were sued under the above caption in the circuit court of Poinsett county, and the Commodity Credit Corporation has appealed therefrom.

We will attempt a statement of the facts that appear to be without dispute or controversy.

The Trumann Compress & Warehouse Company was engaged in business at Trumann in Poinsett county, and on November 10th, 1935, policies of insurance were issued to the Trumann Compress & Warehouse Company, Inc., "for the account of Whom It May Concern." The appellant had stored several thousand bales of cotton in the warehouse at Trumann for which the Trumann Compress & Warehouse had issued receipts, reciting that the cotton represented by the receipts was insured. The Commodity Credit Corporation had entered into a contract by which it was to pay to the Warehouse Company the sum of five mills per day for each bale of cotton so stored, which payment was to cover insurance and storage charges.

The Warehouse Company at the time these insurance policies were issued paid to the insurance companies $1,750, although the agreement recited it should have paid as down payment $2,000. It later sent checks to the insurance companies to cover the $2,000, but these checks were dishonored.

Fires occurred on April 1st, 2nd, and 4th, 1936, at the time when insurance premiums had not been paid thereon that had become due some months before. The policies of insurance required the Warehouse Company to make monthly reports of the amount of cotton received; and from such reports there would be determined such amounts that might fall due by reason of the increased risks.

At the time of the fire of April 4th, 1936, the insurance companies canceled the policies and there was then due on that date net premiums of $5,283.99. Although the insurance companies might have canceled the policies by reason of failure or delay to pay premiums, they had not done so. There was a loss on account of fires exceeding $12,000, which loss was credited with salvage of burned cotton, leaving a net loss for cotton of $5,455.76. The trial court made some adjustments in amounts and credited the net loss with the net amount of unpaid premiums and gave judgment accordingly to appellant for $476.22. The appellant contends that it is entitled to re-

cover the full amount of the net loss and that it is in no wise liable for the unpaid premiums. The case was decided before the court without the intervention of a jury and the evidence will be given that consideration most favorable to support the findings of the trial court. So in the statements that follow we state the factual matters as we think the trial court may have found them in favor of appellees, giving due regard to such matters as may appear undisputed.

The Trumann Compress & Warehouse Company will be referred to hereinafter as the Warehouse Company, and the Commodity Credit Corporation will be referred to as appellant or as Credit Corporation and the insurance companies will be called appellees or merely insurance companies, in our statements and comments hereinafter set forth.

The warehouse was operating at Trumann, Arkansas, where it had located a large compress and warehouse building, in which was stored all of the cotton damaged or destroyed by the fire above mentioned. In fact, as we understand it, there was considerably more cotton located therein than was injured or damaged. The four insurance companies issued the policies in the aggregate amount of $550,000. The credit corporation had entered into a contract with the warehouse company whereby it was to pay one-half cent per day for each bale of cotton stored with the warehouse company and now says its agreement was that this amount was to pay all warehouse charges and for insurance. Insurance for the previous year was about to be canceled at the time the policies sued on were procured to be issued by appellees. The reason for the cancellation of the older policies, or whether they were policies issued by the same companies as appellees, is not certain, and it perhaps makes no difference at this time who the former insurers were.

Pertinent facts to be considered and which seem to be without substantial dispute are to the effect that the credit corporation might move its cotton unless it could get the protection of the insurance. Mr. M. F. Block of

1164

Paragould, who is the agent for the companies writing the insurance sued upon, in an effort to get policies issued made a trip to St. Louis, and upon his return from St. Louis made a trip to Memphis where he met a managing official of the credit corporation and conferred with him in regard to the policies. Before he had done this he had issued what is known in insurance circles as a "binder," or binding contract and had wired the appellant stating this fact. Mr. Block in his testimony says that certain material matters .in these policies were worked out and written by the credit corporation. It did furnish certain provisions that it desired to have incorporated in the policies, and these provisions were made a part thereof, when the policies were issued. The provisions are as follows:

"All or any part of the cotton described in this policy and or certificate having been pledged under the Cotton Loan Plans of the Commodity Credit Corporation, as security for loan granted by said Commodity Credit Corporation or lending agencies, it is a condition of this insurance that in event of loss or damage to any of such cotton so pledged, the basis of adjustment shall be the actual cash value at the time and place of the loss, as set out elsewhere in the printed conditions of this policy or certificate, except that if such actual cash value is less than 12 cents per pound plus accrued interest and accumulated charges, then such actual cash value shall be disregarded and the value of any cotton so pledged shall be deemed to be 12 cents per pound plus interest and accumulated charges.

"Limited liability cotton control act.

"Notwithstanding any of the other terms and provisions of the policy to which this indorsement is attached and made a part, it is understood and agreed that on all cotton for which the assured fails to furnish 'certificates of tagging,' as provided for in the Cotton Control Act, enacted by Congress and approved April 21, 1934, 48 Stat. 598, and all regulations issued thereunder, the price or value, in the event of loss or damage, shall be the amount determined by subtracting from the market value

of such cotton at the date and place of loss or damage the amount of tax levied under the said Cotton Control Act on the ginning of such cotton.''

Although the binders had been executed at this time the policies had not been issued because the form that they should take and the provisions therein had not been agreed upon. At the time the credit corporation submitted the provisions it desired to have in the new policies, it suggested that the insurance should be written to ''Trumann Compress & Warehouse Company, Inc., for account of Whom It May Concern.''

There was a contract entered into between the credit corporation and the warehouse company. This contained many provisions, but the only ones relating directly to any matter of insurance was as set forth. The agreement was that the credit corporation should pay the stipulated price of five mills, or one-half cent per bale for each day the cotton was stored in the warehouse and that this amount was consideration for all storage and for insurance. Some other matters in relation to this contract perhaps should be stated as they have been presented in argument on this appeal.

The warehouse company had agreed to compensate the credit corporation for losses or damages that might accrue by reason of any failure on the part of the warehouse company properly to care for the cotton stored with it or duly compress, or for failure to return to the credit corporation cotton represented by receipts issued.

For other cotton and the damaged cotton, other than that destroyed by fire the warehouse company became indebted to the credit corporation in an amount in excess of $80,000. The credit corporation had not paid under this contract the storage and insurance charges owing at the time of the fire. The credit corporation, however, was not in default in this regard as its contract called for payment to be made when the cotton was removed from the warehouse or on whatever remained in the warehouse on July 1st of that year. The amount owing to the warehouse company was computed and credited on the indebtedness owing by the warehouse to

the credit corporation leaving a balance due the credit corporation by the warehouse company in excess of $51,-000. This settlement whereby the warehouse company was paid the full charges for storage and insurance was made after the time of the fire, after notice to the credit corporation of default in the payment of premiums for insurance and, as we understand, after demand by credit corporation for payment of losses that had accrued by reason of, or on account of the fires on the 1st, 2nd, and 4th day of April, 1936.

The warehouse company was insolvent and about that time or shortly thereafter became bankrupt. By the above mentioned process of charging up against the warehouse company the amount it owed the credit corporation and giving credit thereon for storage and insurance charges, the credit corporation reduced the amount of indebtedness owing to it and upon which it probably was required to take substantial losses by reason of the insolvency and bankruptcy of the warehouse company.

We do not think that the above stated facts are determinative of any of the substantial rights of the parties of this controversy, but we state them because it is argued most forcefully by appellant that the judgment of the trial court, if permitted to stand, is such in effect that the credit corporation is required to pay the insurance premiums the second time. While it may be true that that is the legal conclusion warranted by the facts stated, yet it is equally true that the credit corporation has lost no substantial sum of money by this bare bookkeeping process, whereby it credited upon a debt it never could collect the amount of indebtedness owed by the insolvent bankrupt warehouse company.

Appellant claims that it should be protected upon the same theory that it would be if it were a mortgagee and the insurance had been issued to the mortgagor as actual owner of the property and to it as its interest might appear. If that were the exact situation the case would resolve itself into one of simple factual finding and appropriate declarations of legal rights.

In stating our conclusion we proceed upon the theory that the insurance companies knew nothing of any contract between the credit corporation and warehouse company and were not advised as to any matters that might impair or affect any substantial right that they had. Now that the contract has been developed and appears in this record, after giving it due consideration as it has been presented we fail to see how the appellant may derive any comfort from any of its provisions. The insurance did not purport to cover any property belonging to the warehouse company. It covered only cotton stored by the warehouse company and upon which the insurance was written. The argument is not very persuasive that the warehouse company had a lien upon the cotton for storage charges for the reason it had more than that; it had a written contract with the credit corporation to pay all these charges, and no doubt would have been willing to waive its so-called lien at any time to procure this contract. Perhaps this is the effect of the contract, but it is not necessary to decide that matter as it is not in issue. So it would appear that the suggestion might be that the warehouse company had no insurable interest. There is also insistence that the credit corporation had only a lien on this cotton for money loaned. Its entire course of conduct was that of owner. We now call attention to one of the provisions the credit corporation procured to be inserted in the insurance policies as a part thereof. The effect of this provision is that the insurance should cover the full market value of the cotton which market value should be treated for the purpose of insurance as not less than 12 cents per pound and accrued interest and charges. Perhaps a bare statement of this matter may be the determination to a very high degree of the rights of the insured and insurer. The credit corporation filed this suit upon the theory that the insurance was issued to the warehouse company for its benefit and as a third party for whom a contract was made as beneficiary, it had a right to sue.

. If we consider the foregoing stated terms of this agreement written into the insurance policies at the request of appellant, and if we further consider that at the time of the fires the cotton might have been worth, say 10 cents per pound on the market, we think the conclusion is irresistible that the insurance was not written for the protection of any beneficiary except the credit corporation. Certainly, if by any theory of being a trustee or general agent for the credit corporation the warehouse company might have sued, it could have recovered the investment the credit corporation had in this cotton only for the exclusive benefit of the credit corporation.

Ordinarily as a result of a fire, however negligent the warehouse company might have been, it would have been liable for no more than the market value at that time. The very terms of this agreement written and requested by the credit corporation, inserted in the insurance contract at its request, is so highly persuasive that the insurance was intended for the protection of the credit corporation alone that we are impelled to agree with the trial court in holding substantially that this was the effect thereof.

We are not ignoring the contract between the warehouse company and the credit corporation which provides that the warehouse company shall carry this insurance. In other words they had a right to agree between themselves in their business relations and dealings with each other that the warehouse company should pay these premiums. They did agree to that and the money was contracted to be furnished for that purpose by the credit corporation though the warehouse company absorbed it in the creation of other indebtedness and did not, on that account, properly apply that portion of the money received for that purpose. In carrying out the provisions of its contract the warehouse company paid the $1,750. The record does not show that there was any agreement or understanding that would amount to even an estoppel binding the insurance companies to accept the warehouse company alone as bound for the premiums. It may have been true that the agent was

expecting that the warehouse company would pay the premiums, but there is no evidence that he acted with, or without, authority in any manner that might be interpreted as a waiver of the payment of the premium by the insured.

If the foregoing statements are not conclusive that the credit corporation in the issuance of these policies was deemed and treated as the sole party insured the effect of such is that the trial court was thoroughly justified in so holding. So, if we may deem the credit corporation as in effect the party whose property was insured there are other deductions that must necessarily follow which we state in our comments and conclusions.

Besides the foregoing stated facts which we have to some extent analyzed there was an agreed statement of facts presented to the trial court as follows:

"Agreed statement of facts.

"It is stipulated and agreed by and between counsel that this cause may be submitted to the court upon the following agreed statement of facts and such other evidence as may be introduced at the trial.

"Commodity Credit Corporation is a corporation organized and existing under the laws of the state of Delaware and is engaged in the business of lending money to farmers, such loans being secured by the deposit of agricultural commodities in warehouses.

"Defendants are corporations engaged in the business of writing fire insurance, and duly authorized to do business in the state of Arkansas.

"Trumann Compress & Warehouse Company, Inc., hereinafter called the Warehouse Company, is a corporation which was engaged, at the time of the transaction hereinafter mentioned, in the warehouse business at Trumann, Arkansas.

"On November 10, 1935, the Warehouse Company purchased fire insurance policies with an aggregate limit of liability of $550,000 and said policies were issued to Trumann Compress & Warehouse Company, Inc., for account of Whom It May Concern. That the defendant

companies carried the percentage set out opposite their respective names:

American Equitable Assurance Company
of New York, Policy 4-395105........................................ 20%

Millers National Insurance Company
of Chicago, Policy 115122................................:........................ 50%

Lumbermens Underwriting Alliance of Kansas
City, Missouri, Policy 24993.................................•................ 10%

Pacific Fire Insurance Company
of New York, Policy 919.................................................... 20%

"All of said policies were in the same form, being the standard Arkansas form of reporting form policies for warehouses, and said policies were outstanding at the time of the fires hereinafter mentioned. A copy of one of said policies, together with all riders attached thereto, is attached hereto, marked 'Exhibit A' and made a part hereof.

"Each of the above listed policies was issued for the sole purpose of covering loss or damage to cotton on which the Commodity Credit Corporation had loans and held insured warehouse receipts. That no insured warehouse receipts were issued by the warehouse company during the time these policies were outstanding, except to the Commodity Credit Corporation, and on which the said Commodity Credit Corporation had loans. A copy of one of said receipts is hereto attached, marked 'Exhibit B' and made a part hereof.

"The cotton on which the Commodity Credit Corporation had made loans was stored with said Warehouse Company under the terms of a written agreement entered into between the Commodity Credit Corporation and the Warehouse Company dated October 25, 1935, a copy of which is hereto attached, marked 'Exhibit C' and made a part hereof.

"To secure the performance of its contract, the Warehouse Company executed to the Commodity Credit Corporation its surety bond, a copy of which bond is hereto attached, marked 'Exhibit D' and made a part hereof.

"At the time of the fires hereinafter mentioned, the Warehouse Company was indebted to the Commodity Credit Corporation in the sum of $21,501.39 as expenses for recompressing, repatching and reconditioning cotton which had been stored with the Warehouse Company and which had been delivered to the Commodity Credit Corporation without having been so recompressed, reconditioned and repatched by the Warehouse Company as was required to be done under the contract. The Warehouse Company was further indebted to the Commodity Credit Corporation in the sum of $21,568.73 for 362 bales of cotton which were delivered to the Commodity Credit Corporation by the Warehouse Company in an unmerchantable condition. The Warehouse Company was further indebted to the Commodity Credit Corporation in the sum of $38,265.16 for 601 bales of cotton which had been deposited in the warehouse, receipts being issued therefor and which the Warehouse Company was unable to locate and deliver to the Commodity Credit Corporation.

"At the time of the fires hereinafter mentioned, the Warehouse Company was entitled to credit of $13,562.62 as the net proceeds received from sale of the above mentioned 362 unmerchantable bales of cotton which were delivered to Commodity Credit Corporation. There were other credits of $3,318.74 for proceeds received from the sale of damaged pickings, and of $817.29 for proceeds received from the sale of light-weight nobs, pickings and paper stock at Trumann. The Commodity Credit Corporation was indebted to Trumann Warehouse Company, Inc., in the sum of $12,221.44 for storage, insurance and all other charges in connection with the storage of cotton.

"Summarizing the above figures the Warehouse Company was indebted to Commodity Credit Corporation in the sum of $81,335.28 and entitled to credits of $29,920.09, leaving a balance due Commodity Credit Corporation of $51,415.19.

"Fires occurred at said warehouse on April 1, 2, and 4, 1936, damaging 197 bales of cotton. Of said bales,

102 were identified as government loan cotton (that is, cotton on which Commodity Credit Corporation had made loans and placed in Trumann Warehouse under insured receipts) and 20 bales were identified as belonging to the U. S. Rubber Company. It was agreed between Commodity Credit Corporation and the United States Rubber Company that the salvage from the unidentified 75 bales should be distributed on a basis of 585/595ths to Commodity Credit Corporation and 10/595ths to United States Rubber Company.

"The value of the cotton damaged by fire was $12,-704.62. The 197 damaged bales were sold by the Underwriters Salvage Company for a net amount of $8,125.80. Of this amount $7,248.86, the net amount realized after payment of expenses of reconditioning and other expenses, is held by Underwriters Salvage Company. The net loss to the plaintiff would therefore be $5,455.76, if the sum held by the Underwriters Salvage Company is paid to it.

"The actual market value of all cotton stored under insured receipts at the time of the fires, calculated on 9,949 bales, at 500 pounds each, at 11.87 cents per pound, would be $563,486.92. The loan value, which is arrived at by valuing cotton at twelve cents per pound, which was the amount the Commodity Credit Corporation loaned thereon to producer, and adding accumulated interest and other charges, was approximately $71.77 per 500 pound bale, or $681,455.59 for all cotton stored under insured warehouse receipts.

"The policies were canceled at noon April 4, 1936, after the last fire occurred on that date. The Warehouse Company advanced $1,750 on the premium, but the balance remains unpaid.

"On May 23, 1936, the Warehouse Company was adjudicated bankrupt. Claim was made by the Commodity Credit Corporation against the sureties on the bond executed by the Warehouse Company to the Commodity Credit Corporation. Settlement was made by the sureties on the bond of the Warehouse Company for the amount due the Commodity Credit Corporation after al-

lowing credit for $12,221.44 owing by the Commodity Credit Corporation to the Warehouse Company for all storage and insurance charges.''

Many of these matters may properly be considered. The first is that the warehouse company purchased the insurance from the four insurance companies, not on any property belonging to it, but ''for the sole purpose of covering loss or damage to cotton on which the Commodity Credit Corporation had loans and held insured warehouse receipts.'' There were no other insured warehouse receipts except those held by appellant. There is no claim or contention that the warehouse company was the actual or real beneficiary of any insurance. But we find from a policy these selected provisions:

''The premium named in this policy is provisional only.

''The actual premium consideration for the liability assumed hereunder shall be arrived at by the following method.

''It is a condition of this policy that the assured shall report to this company not later than ten days after the first day of each month, the total value on hand as of the last day of the previous month at the location mentioned above. It is further understood and agreed that after the deposit premium named herein has been exhausted the assured shall pay to this company its pro rata proportion of the premium that has been earned for the previous month's coverage and that failing to do so, shall render this policy null and void.

''This company shall not be liaible for more than such proportion of any loss as the limit of liability mentioned above bears to the value of cotton covered by insured receipts at the time of any loss or damage.

''Warranted by the assured: To give immediate notice to this company of any loss or damage; that this company shall have the right to investigate the circumstances attending the same, the condition of the assured's records, the amount of loss and to handle and dispose, of the salvage, if any, and collect premiums due and to

become due under this policy, without admitting liability and without waiving the right to deny liability on account of any breach of warranty or condition of this policy or any right of this company under this policy.

"Warranted by the assured: (A) That he will make and preserve at all times an accurate record of all cotton received and shipped, showing the weight, classification and identity of each bale, its location and change of location, and the dates of all such transactions, which record shall be open at all times to the inspection of any authorized representative of this company upon request; (B) that in the event of loss or damage hereunder, he will deliver such records to this company.

"It is understood and agreed that the amount of insurance set forth above is only provisional, the true intent of this insurance being to fully protect the assured at any and all times to the extent of the value the assured may have at risk hereunder, not exceeding, however, the limit of liability expressed above."

The portion of the policy just above copied is followed by that portion of the same policy which was prepared by the Credit Corporation and was inserted therein as a part of the insurance contract. It seems very definitely to be evidence the trial court might not properly disregard in a determination of the party insured. It is true that in some instances the Warehouse Company is called the "Assured" but it is no less true that the same term is just as applicable to the Credit Corporation. The Credit Corporation accepted the status if not the name "Assured" in dealing with the salvage from the 197 bales of cotton damaged. In the complaint filed it pleaded: "It was agreed between the Commodity Credit Corporation and the United States Rubber Company that the salvage from the unidentified 75 bales should be distributed on the basis . . ." Also "The damaged 197 bales were sold by the Underwriters Salvage Company for a net amount of $8,125.80." The plaintiff was claiming from this $7,248.86. The amount sought when the suit was filed was accordingly reduced.

In regard to the matters stated we have reached the following conclusions: It was the obligation as between the Credit Corporation and Warehouse Company that the latter should pay the insurance premiums. It had so contracted. But there is no proof that the insurance companies or their agent knew this fact. It is argued that the insurers gambled on the results in not cancelling the polices when the default occurred and should not now be permitted to assert a claim for the unpaid premiums. The answer is that since the Credit Corporation was the assured, and had the policies and knew the premiums were provisional and failed to report from month to month the increased amount of cotton insured and stored, it thereby avoided notice of additional premiums provided for in the face of the policies. There is in that respect the undisputed fact that the total value of property on which insurance is claimed was $681,-455.59. On this risk the total insurance was $550,000.

The first question at issue is the right of the insurance companies to set off the unpaid delinquent insurance premiums against the admitted liability. The second question is the right to apportion the insurance to the whole amount at risk.

The trial court determined the facts as suggested above, that is, the Credit Corporation was the "assured" in fact, with its full investment intended to be covered up to the limit of $550,000 that there was no contract to which the insurance companies were parties, or had knowledge, or notice, that the "assured" should not pay premiums.

We think there should be a recognition of the principle that the warehouseman is not required to insure property for the benefit of the owner, but may be liable for negligence in a proper case. *St. Louis Iron Mountain & So. Ry. Co.* v. *Bone,* 52 Ark. 26, 11 S. W. 958; *Kansas City Southern Ry. Co.* v. *Thomas,* 97 Ark. 287, 133 S. W. 1030.

So the obligation of the warehouseman to take insurance was one of contract between the warehouseman and the credit corporation. Indeed, it has been held that

where a warehouseman takes out insurance, such insurance is for the benefit of the owner and the warehouseman is regarded as the agent of the owner thereof. The owner may, at the time of the loss, not know of such insurance. He can ratify or adopt the contract when informed of the insurance after the loss. *Edwards* v. *Cleveland Mill & Power Co.,* 193 N. C. 780, 138 S. E. 131, 53 A. L. R. 1404.

In this case we find no trouble as to the term or expression "Whom It May Concern." We think the evidence is conclusive, if not undisputed, that no one was intended to be designated under that expression except the Credit Corporation. Appellee cites as a rule 26 C. J. 113, the general announcement that even though a person's name does not appear in the application for insurance he is liable for the premiums if in fact he was the principal although the policies were procured by another." There is also cited as applicable *Great Lakes Towing Co.* v. *Mills Transportation Co.,* 83 C.C.A. 607, 155 Fed. 11, 22 L. R. A., N. S., 769. Also the case of *Concord Casualty & Surety Co.* v. *Hemphill & Container Corp. of America,* 318 Pa. 103, 177 Atl. 781.

The appellant distinguishes this last case from the one at bar by arguing that the Container Company is named as insured. That distinction is purely formal and not actual. In this case under consideration the assured is not only proven and admitted, but asserted at every turn. It has also been held that even if a third party elected to avail himself of a contract entered into between others for his benefit he makes the contract his own and must bear the consequent burden if he would reap the benefit. So held in notes, 81 A. L. R. 1292. See, also, *Assets Realization Co.* v. *Cardon,* 72 Utah 597, 272 Pac. 204.

It is there asserted as supported by authority that one may not accept the benefits and reject the burden of a contract he adopts. So we hold that the court was not in error in requiring the insured to accept the burden of the delinquent premiums and credit same upon the amount of recovery.

The only other question is an insistence on the part of appellees that the court erred in fixing the liability in proportion to the amount of insurance carried as compared to the amount at risk. We have heretofore copied the provision from the policies to the effect that the companies are liable for that portion of the loss which the limit of liability stated in the policy bears to the total value of cotton on hand at the time of the loss. It is asserted and admitted that at the time of the fires there was on hand $681,455.59 worth of cotton. The appellant also insists that all of this cotton was covered by insurance, yet it is admitted that the total amount of insurance was $550,000. It is now argued most vigorously that the court erred in apportioning this loss in accordance with that particular provision of the contract above set out and the reason asserted is that the above provision of the policies is in conflict with other portions thereof. However it must be admitted that this particular portion is not ambiguous; that it is clear and unmistakable in its meaning. This provision of the policies seems to be a standard one, consonant with sound principles and uniform use and application, and there is no evidence tending to show that any other portion was intended to be substituted therefor. In truth we have come to the conclusion that if the contention made by appellant is sound, appellant would have been as well protected in this particular case had his insurance been so written that it would have covered only 200 bales of cotton. He could have insisted with the same degree of reasoning that it covered any cotton that might have been destroyed and damaged not in excess of 200 bales and that it covered each bale for the full amount of its value.

We think it clear, therefore, that the court was correct when it held that the insurance companies were liable for $550,000/681,455.59 of the loss.

Our comments have been of undue length perhaps without corresponding benefits to be derived. Our conclusions reached from the facts as they must have been determined by the trial court warrant an affirmance. Affirmed.