**AETNA INSURANCE COMPANY,**
Plaintiff

v.

**Saul EISENBERG, Defendant,**
**Bleidt-Banks Cleaners, Inc., et al.,**
Intervenors.

**No. LR 3626.**

United States District Court
E. D. Arkansas, W. D.

Nov. 1, 1960.

James I. Teague, McMillen, Teague & Coates, Little Rock, Ark., for plaintiff.

Henry E. Spitzberg, Spitzberg, Bonner, Mitchell & Hays, Little Rock, Ark., for defendant.

Abner McGehee, Cockrill, Laser & McGehee, and John Thurman, Jr., Barber, Henry, Thurman & McCaskill, Little Rock, Ark., for interveners.

YOUNG, District Judge.

This is an action for declaratory judgment (28 U.S.C.A. § 2201 (1958)) upon a policy of inland marine fire insurance. Plaintiff, Aetna Insurance Company, seeks to have the policy, a Furriers' Customers Basic Policy issued to defendant, Saul Eisenberg, doing business as Saul Eisenberg, Exclusive Furrier, in Little Rock, Arkansas, declared void because of defendant's alleged fraud and violation of a policy promissory warranty in making false monthly reports of storage values. Customers of Eisenberg's having claims under this policy have been allowed to intervene to prevent a multiplicity of actions upon the same facts. Fed.R.Civ.P. 23(a) (3), 28 U.S.C.A.

A bailee's customer policy has been in effect between Aetna and Eisenberg since January of 1934, with the policy form here in question having been executed in March of 1946; various endorsements as to premium rates or limits of coverage had increased the coverage to $200,-000 when, on July 22, 1958, fire badly damaged garments stored with defendant that were within the coverage of the policy. The evidence did not disclose the number of garments stored at the time of the fire, but according to the audit subsequently made there were "approximately 2,000 cards", or storage receipts, outstanding, a number of which included more than one garment. In adjusting this loss plaintiff discovered that the value of garments stored with Eisenberg had been substantially understated in his reports to plaintiff from January 1958 through June of that year. These reports were the basis for premium calculation.

Eisenberg defends upon the grounds of estoppel and waiver, and counterclaims for policy limit coverage. The intervenor-customers maintain that their rights under the policy are not affected at all by any rights or defenses that plaintiff may have against Eisenberg; they allege that Eisenberg was the agent of Aetna for the issuance of the insurance on their garments, that he so held himself out, and that this holding out was known to Aetna. Further, the customers allege that it was the duty of Aetna to audit the records of Eisenberg to see that correct reports were being made, and that it is now estopped to void

the policy for improper value reports by Eisenberg. Upon these grounds they seek to invoke the principle that where one of two innocent persons must suffer, the loss should fall upon the one who made it possible for the loss to occur. It is the position of Aetna that the customers' rights are subject to the same limitations as are the rights of Eisenberg.

The bailee's customer policy herein question insured only furs and garments trimmed with fur owned by third parties which were accepted by Eisenberg for storage, alteration, repairing, cleaning, or remodeling, and for which he issued a receipt which included an agreement that he would effect insurance for the customer. The garments so covered were insured against all risks of loss or damage, including Eisenberg's legal liability therefor, subject to the policy exclusions, one of which specifically excluded property belonging to Eisenberg from policy coverage.

Under this policy customers storing garments with Eisenberg had an option, if they wished insurance, of securing a one year floater insurance policy issued by Aetna and countersigned by their local agent, or of securing coverage under the Customers Basic Policy. They received in either event a storage receipt which contained the following statement: "The furs, garments or property covered by this receipt are insured as stipulated below for $————, under Blanket Policy Number ————, issued by the ———— Insurance Company." The name "Aetna" was written in the last blank except in the few instances disclosed by the testimony where it was inadvertently omitted. This was done with plaintiff's knowledge. The conditions stipulated on the face of the receipt were, in general, those required by the policy of insurance to be included in the receipt given by the furrier to his customers. One of the conditions of the receipt reads: "At the request of the depositor and as part of the consideration for the charge set opposite each item herein listed below, the undersigned hereby

agrees to effect for the benefit of the depositor insurance on the articles listed in this receipt which shall, in terms usual to such insurance, cover against loss by fire and theft for the value set opposite each item, which value shall represent respectively the limit of liability for loss of or damage to the same."

The "value set opposite each item" was the value declared by the bailor customer of Eisenberg. The total declared value of all items stored, to be determined by the total of the deposit receipts outstanding, was to be reported by Eisenberg to Aetna at the end of each month. His premium was computed upon the value so reported, though Eisenberg denied knowing this was one of the uses served by his monthly report. The basic policy had also total policy limits upon the insurance liability assumed by Aetna; as to locations used for storage of garments, the limit at the time of the fire was, as previously noted, $200,000 for one casualty. It was of course contemplated that the total limit of liability would be, ordinarily, in excess of the declared value stored with the insured, and the monthly report of Eisenberg also served to inform the company in this respect. Total policy limits had been raised several times over the 24 years that plaintiff and defendant did business to provide complete coverage of the insured items stored with defendant.

The policy contemplated that Eisenberg would report the total of all receipts issued, whether the garment was covered by an individual floater policy or by the basic policy. However, plaintiff's local agent told Eisenberg to report only the total values shown on receipts for garments insured under the basic policy; the agent himself compiled the total of the declared values covered by the individual floater policies from the duplicate copies retained by Eisenberg. On these individual policies Aetna has accepted liability, admitting that the grounds here asserted against liability under the basic policy—the false monthly reports by Eisenberg—would not reach those individual policies. Though the in-

tervenors allege that this admission of liability on the individual policies estops Aetna from voiding the basic policy, I do not regard such admission as having any relevance, and have given it no weight in reaching my decision.

In adjusting the loss caused by the fire in defendant's vault on July 22, 1958, Aetna discovered that the declared value of the garments in storage greatly exceeded the amount shown by Eisenberg's last report, even allowing for normal additional deposits. Thereupon, Aetna ceased adjusting the loss and executed a non-waiver agreement with Eisenberg. An audit of the receipts in Eisenberg's possession at the time of the fire shows a substantial variance between the values declared by customers and the values reported to Aetna, as follows:

| Month's End | Total Values In Storage, Exclusive Of Individual Policies | Values Reported To Aetna |
|---|---|---|
| January 1958 | $ 2,750.00 | $ 450.00 |
| February 1958 | 2,750.00 | 550.00 |
| March 1958 | 8,850.00 | 1,050.00 |
| April 1958 | 88,055.00 | 73,550.00 |
| May 1958 | 176,465.00 | 110,550.00 |
| June 1958 | 204,890.00* | 115,750.00 |
| — — — | — — — | — — — |
| July 1958 (22nd) | 209,820.00 | |

*Includes $2,180.00 in declared values shown by undated storage cards.

Note: The figures used as total values in storage, exclusive of individual floater policies, are taken from plaintiff's exhibit number 5, page 5, prepared at my request by plaintiff's accountant from his worksheet. It thus varies from his schedule attached to his audit, plaintiff's exhibit number 5, page 4, which included declared values covered by the individual policies in the amount of $5,350.00 as of June 30, 1958.

———◆———

Receipts for the period prior to January 1958 are not available.

The evidence further shows that Aetna's local agent furnished Eisenberg advertising "cuts" of the Aetna trademark, which Eisenberg used extensively in his newspaper, direct mail, radio, and telephone book advertising. Eisenberg also maintained large signs in his shop windows during storage seasons which disclosed Aetna insurance was available upon garments stored with him. The evidence shows that Aetna was familiar with this advertising by Eisenberg. On one occasion it advised Eisenberg to eliminate from his advertising statements indicating that the insurance covered damage by moths, and the local agent testified that he had seen the window signs in the course of his monthly visits to Eisenberg's store to pick up the reports of values in storage.

If the rights of third-party beneficiaries were not involved in this action, I would have no hesitation in holding that Aetna was entitled to have the policy declared void. I am not convinced by Mr. Eisenberg's testimony that he did not know the reports submitted determined the premiums he paid; the policy is very clear on this point, and, although Mr. Eisenberg professed to have little formal education, he is a person of intelligence and could easily have informed

himself on this point from several sources. Additionally, there is positive evidence in the record that he was so told, and I accept this as true. Twice his records were audited on behalf of Aetna in 1950 and 1951. The first time his reports were found to be incorrect and he was instructed as to the correct manner of keeping and reporting the storage receipts; at the next audit his reports were found to be correct to the penny. I believe, therefore, that Mr. Eisenberg knew the purpose of the monthly reports, and knew how to properly prepare them. I find nothing to support the assertion that Aetna's local agent assisted in the preparation of the values reported except as to the floater policies.

Aetna's agent called on Eisenberg at intervals of about one month to get a report on the value of the furs in storage. On some of these occasions when Aetna's agent would go to Eisenberg's premises for the monthly report, Eisenberg would go into his office to get the figure; on other occasions he would not go into the office but would go into the vault, and after staying there a short time, emerge with the figure. Eisenberg testified that when he went into the vault he made a rough estimate of the value of the furs located there and this was the basis of the figure he gave the agent. He did not say, however, that the agent knew that this was the method of his calculations and the agent denied knowing that the monthly figures so furnished were estimates.

█ The presence of the intervenor-customers, third-party creditor beneficiaries of the bailee's customer policy, introduces more complex considerations. It cannot be doubted that they have the right to maintain a direct action against Aetna upon the policy. Davis, Rights and Liabilities of Principals in the Insurance Relationship—A Partial Survey, 5 Ark.L.Rev. 24, 37 (1950-51). The point at issue in this cause concerns the defenses that Aetna may assert against such third-party beneficiaries: Aetna maintains that the beneficiaries must accept the contract with all of the defects it would have in the hands of the promisee, Eisenberg. The intervenor-customers insist that they, as a class, have demonstrated a reliance upon, and a change of position because of, the insurance contract, so that they are not subject to defenses personal to the promisor as against the promisee.

█ Admittedly the general rules of contract law apply also to insurance contracts, but cases upon the point in question—the rights of third-party beneficiaries against promisors—in the specific factual setting of a bailee's customer policy, are very rare, and turn upon facts peculiar to that case. For example, Millers National Ins. Co. v. Bunds, 1944, 158 Kan. 662, 149 P.2d 350, 153 A.L.R. 176, turned upon Kansas statutes regulating warehousemen. Automobile Ins. Co. of Hartford, Conn. v. Barnes-Manley Wet Wash Laundry Co., 10 Cir., 1948, 168 F.2d 381, was an instance in which the insurance company waived breach of the policy by making loss payments after knowing of the under-reporting. The court was therefore not called upon to decide whether this under-reporting could have been asserted against third-party beneficiaries. Moreover, the policy was not advertised or otherwise brought to the attention of the laundry customers. That policy contained a specific provision that improper reports by the bailor would be an absolute defense to any action on the policy. There is no similar provision in the policy involved here. In Commodity Credit Corp. v. American Equitable Assurance Co., 1939, 198 Ark. 1160, 133 S.W.2d 433, upon which Aetna relies heavily in this case, it is clear that because of the factual background of that case the court regarded the third-party beneficiary as, in fact, the "assured" party to the insurance contract and the party primarily liable for the policy premiums, so far as the insurance company knew; the warehouseman, though liable as to the bailor for the payment of premiums, was not the party obligated to pay them to the insurance company; from such unusual facts I am unable to

make *any* definitive *decision* as to what the Arkansas Supreme Court would hold upon the facts presented in this case.

As to reliance and change of position, the evidence submitted is somewhat unsatisfactory. Certainly the intervenor-customers believed that Eisenberg was insuring their garments, as he promised to do, and for which purpose he was their agent. See 3 Couch, Insurance § 25.81 (2d Ed. 1960). Certainly many, if not all, of the customers knew that the insurance was with the Aetna Insurance Company, though it is uncertain how many of the intervenor-customers stored their garments with Eisenberg rather than with another because of the identity of the insurance company. It is undisputed that Aetna knew that Eisenberg was widely advertising the insurance coverage he had as a means of promoting his business, and knew that customers would rely in some degree on this representation. Yet, to some extent, Aetna might be justified in assuming that the customer would realize that it was possible that matters would occur which would relieve Aetna of liability, as in any insurance situation, and would realize that the insurance policy was not an absolute guarantee against loss. The issue, therefore, as I see it, depends entirely upon what defenses the promisor may assert against a third-party beneficiary of a bailee's customer policy.

Initially, it may be easily seen that a bailee's customer policy is most unlike the ordinary third-party contract. The contract is made for the benefit, and intended reliance and use, of an unknown class of persons; as it is a continuing contract, the identity of this class will continually change, and will enlarge and contract as garments are stored or withdrawn from storage; it will include, inevitably, different persons every year. From the standpoint of the insurance company, the most important matter covered by the contract is the total of declared values in storage, which, in the instant case of a furriers' basic policy, is known to fluctuate widely throughout the year. Aetna also knew, or should

have known, that the history of fluctuating premium insurance, insurance in which the premium is determined from values reported by the warehouseman or other bailee, indicates that under-reporting, from whatever cause—intentional or unintentional—is a substantial risk that it assumed. See Annotation, 13 A.L.R.2d 713 (1950). Thus, when the policy of insurance was issued the insuror neither knew the beneficiary of the policy nor the amount of the insurance in force, save for the upper limits established, and would not know the amount of the insurance until receipt of the report required by the policy, which was to be, of course, sometime after the close of the specified period, in this case, by the 15th of the following month.

Another point of difference between the bailee's customer policy and an ordinary third-party beneficiary contract is that the policy ordinarily covers more than the legal obligation of the bailee to his bailors; it insures the bailor's interest to the extent of the policy terms, which are ordinarily more extensive than his rights against the bailee. While in many bailee's customer policies the bailors do not know of the existence of the policy until after the occurrence of the loss, the policy here in question anticipated and directed that the bailors be informed of the existence of the policy; moreover, here the bailors were afforded a choice between coverage under the basic policy and coverage under individual floater policies. Whichever option they chose, they paid directly for the coverage by an amount included in the storage fee—the beneficiary himself paid the premium, rather than the policy promisee, though it was collected by Aetna from the promisee.

■ The policy in question provided, as noted, that Eisenberg was to maintain accurate records of storage receipts, was to retain the records through the following year, and was to allow inspection of these records at any reasonable time. Twice in the 24 year history of the policy Aetna made such inspections, one of which disclosed inaccurate reports. It

is upon such a policy and upon such facts that Aetna maintains that its right to avoid the policy as to Eisenberg because of his false monthly statements is available to it as a complete defense against the claims of third-party creditor beneficiaries to that policy. In view of the nature of the policy of insurance here in question and in view of the relationship of the parties thereto, I have concluded that this defense is not available to Aetna against the intervenor-customers, and that they may recover upon the policy without regard to Aetna's rights against Eisenberg.

Even in an ordinary third-party beneficiary contract the authorities indicate that where the defense does not relate to the origin of the contract, but, rather, is based upon supervening circumstances, the question as to whether the defense may be maintained against the third-party beneficiary is not definitely settled. As Professor Corbin has observed, "(a)fter the contract is made, however, and the primary legal relations of promisor, promisee, and beneficiary have been created, it is not at all correct to say that supervening defenses that would be good against the promisee are good also against the beneficiary. The right of the promisee and the right of the beneficiary, although born of the same creative factors and with the same inherited defects, now have separate lives of their own; and the vicissitudes that are met by the one do not necessarily affect the other." 4 Corbin, Contracts § 818 (1951). Certainly in the instant case Aetna had the primary interest and right to exact accurate reports from the bailee, Eisenberg, and it alone had the right to inspect his records. Only Aetna was interested in the total of declared values in storage, for the individual customer, having paid for the insurance coverage available, was not interested in the values declared by other customers, and was in no position to know whether Eisenberg's reports to Aetna were accurate, nor had he the right to inspect records in order to know. Although Eisenberg may have been the agent for the bailor-customers in securing insurance coverage, it is apparent that Eisenberg and Aetna were engaged in a commercial venture for the profit of each, which Eisenberg widely advertised, with the knowledge and consent of Aetna. It is further apparent that Eisenberg was a soliciting agent for Aetna as to the individual floater policies, Fireman's Fund Ins. Co. v. Leftwich, 1936, 192 Ark. 159, 162–163, 90 S.W.2d 497, and was perilously close to being, if indeed he was not, the agent of Aetna under the basic policy. Having regard for all of the facts and circumstances unique to a bailee's customer policy and to the course of dealings between these parties over a period of 24 years, I hold that the contract between Aetna and Eisenberg was distinct and separate from that created between the bailee-customers and Aetna by the issuance of the storage receipt authorized by the policy and the payment by the customer of the storage fee which included the insurance premium. I hold that against the bailee-customers Aetna may not maintain the defense of Eisenberg's false monthly reports; upon the record of this case the bailee-customers are entitled to a declaratory judgment allowing them to recover the amount of their loss, subject to the applicable policy provisions, against plaintiff, Aetna; the aggregate of all such claims, however, not to exceed the policy limits of $200,000.

In view of these findings Eisenberg's counterclaim against Aetna is denied, and it is unnecessary to determine the cross-claims filed by some of the intervenors against Eisenberg. Aetna is awarded judgment against Eisenberg for the amount of the premiums due upon the declared values in storage which he did not report, subject to the policy limits. In this respect it may be noted that the holding in Automobile Ins. Co. of Hartford, Conn. v. Barnes-Manley Wet Wash Laundry Co., supra, is inapplicable, as this policy had stated liability limits, so that there is no question as to the amount of liability that Aetna would have assumed had the correct declared values been reported. Jurisdiction of

this cause will be retained only so far as necessary to effect this decision. The intervenors are denied individual judgments against Aetna, leaving the amount of their individual recovery for settlement between the parties, the right of members of the bailee-customer class having been fully established in this action.